## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| CLAUDINA SUAZO GARCIA,<br><br>          Plaintiff,<br><br>v.<br><br>EQUIFAX INFORMATION<br>SERVICES, LLC,<br><br>          Defendant. | Case No.: 2:26-cv- 00957<br><br><br>**COMPLAINT AND JURY TRIAL DEMANDED** |

Plaintiff Claudina Suazo Garcia ("Plaintiff") brings this action on an individual basis against Equifax Information Services, LLC ("Equifax" or "Defendant") for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et seq., and states as follows:

### INTRODUCTION

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory,

1

all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the

2

personal, private, and financial information that they compile and sell about individual consumers.

6.     "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies."  *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.     Congress made the following findings when it enacted the FCRA in 1970:

(a)     The banking system is dependent upon fair and accurate credit reporting.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b)     An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)     Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d)     There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.     Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the

confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10. Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.    The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13.    The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.    A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15. A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16. "Mixed files" create a false description and representation of a consumer's credit history.

17. The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18. Mixed files are not a new phenomenon. Equifax has been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19. More recently, Equifax has been the subject of numerous state attorney general actions relating to its mixed file problem.

20. For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant over mixed files. *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC*.

21. Notwithstanding Equifax's notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

22. Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Equifax sells information pertaining to one consumer in response to the application of the other.

23. Equifax has been sued thousands of times wherein an allegation was made that Equifax violated the FCRA. Moreover, Equifax is sued, at a minimum, hundreds of times each year wherein an allegation is made that Equifax mixed a consumer's credit file with that of another consumer.

24. FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25. For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The

jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, Equifax continues to mix consumers' credit files with other consumers' credit files.

26.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Equifax continues to mix consumers' credit files with other consumers' credit files.

27.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Equifax continues to mix consumers' credit files with other consumers' credit files.

28.     More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC,

8

2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

29.    "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA).    Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

30.    No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

31.    Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Defendant, to review their procedures when a mixed file occurs.

32.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

33.     Plaintiff's claims arise out of the Equifax's blatantly inaccurate credit reporting, wherein Equifax published in a consumer report about Plaintiff the information of another consumer because Equifax mixed Plaintiff's credit file with that of an unrelated consumer.

34.     Accordingly, Plaintiff brings claims against Equifax for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b); and for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of a mixed file, and for failing to delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

35.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Equifax for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

**PARTIES**

36.     Claudina Suazo Garcia ("Plaintiff") is a natural person residing in Fort Myers, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

37.     Equifax Information Services, LLC is a limited liability company doing business throughout the United States and has a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309 and is authorized to do business in the State of Tennessee, including within this District. Equifax can be served through its registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

38.     Among other things, Equifax sells consumer reports to lenders and creditors which they use to decide whether to extend credit or approve loans to consumers. These reports are provided in connection with a business transaction initiated by the consumer or lender.

39.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

40.     The information Equifax collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245

11

million Americans.  Equifax also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

41.    Equifax collects and maintains such information about consumers, whether consumers like it or not.  Consumers do not have a choice as to whether Experian collects and maintains information about them. Not only that, but consumers cannot remove information that Equifax collects and maintains about them from the Experian database. Further, Equifax sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Experian sold.

## JURISDICTION AND VENUE

42.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

43.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

44.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the

rights of consumers to fairness and accuracy in the reporting of their credit information.

45.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

46.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

47.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

48.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## DEFENDANT'S PROCESSING OF CREDIT INFORMATION

49.    Equifax regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

50.    These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

51.    Equifax collects information from thousands of furnishers.

52.    The process by which Equifax receives, sorts, and stores information is largely electronic.

53.    Equifax takes credit information reported by furnishers and creates consumer credit files.

54.    Equifax maintains credit files on more than 200 million consumers.

55.    Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

14

## DEFENDANT'S MIXED FILE PROBLEM

56.    Equifax knows that different consumers have similar names.

57.    Equifax knows that different consumers can have similar Social Security numbers.

58.    Equifax knows that different consumers with similar names can also have similar Social Security numbers.

59.    Equifax knows that public records often do contain identifying information such as Social Security numbers or dates of birth.

60.    Equifax matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

61.    Equifax accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

62.    From time to time, Equifax's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known as in the credit reporting industry as a mixed or merged credit file.

63.    Mixed files are not a new phenomenon.  In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each

of the major CRAs, specifically including Equifax, regarding its significant failures and deficiencies with respect to mixed files.

64. Despite Defendant's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Equifax containing information belonging to another consumer.

65. A mixed or merged credit file is the result of Equifax's inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

66. There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Equifax to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

67. The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendant.

68. A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Equifax.

69.    Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

70.    Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

## FACTUAL ALLEGATIONS

### Plaintiff Applies for a Mortgage with Home Mortgage Alliance ("HMA")

71.    In or about November 2025, Plaintiff was interested in securing a mortgage, a dream she long held. With a two-year old daughter, Plaintiff and her husband determined that this was the appropriate time to secure a home for their family.

72.    On November 11, 2025, Plaintiff completed and submitted a mortgage application with Home Mortgage Alliance Corp.

73.    For HMA to make a determination on Plaintiff's credit application, it would need to obtain copies of her credit files.  Plaintiff provided HMA with her personal identification information, including her Social Security number, and authorized it to obtain copies of her credit files.

74.    Upon information and belief, Equifax sold a credit report about Plaintiff to HMA in response to Plaintiff's mortgage application.

17

75. Thereafter, Plaintiff was notified by HMA by phone that her application could not proceed at that time because her Equifax credit report indicated a low credit score.

76. Plaintiff was further advised to review her credit file(s).

**Defendant Published an Inaccurate Consumer Report**

77. While reviewing her Equifax credit file, Plaintiff discovered a credit account with HY Cite Corporation / Royal Prestige ("HY Cite") (the "Mixed Account"), opened on April 4, 2025, with a balance of $1,577 and a credit utilization) of 94%, which did not belong to her.

78. Further, Equifax was reporting an address in Miami, FL 33142 which never belonged to Plaintiff.

79. Plaintiff was shocked, worried, and confused at the sight of this inaccurate information.

80. The Mixed Account reported by Equifax does not belong to Plaintiff.

81. Plaintiff has never had any account with HY Cite in her life.

82. Upon information and belief, the Mixed Account belongs to an unrelated female, Claudia Yamilet Suazo Garcia (the "Mixed Consumer"), who shares the same last name, but has a different first name, middle name, and social security number, and, upon information and belief, a different date of birth.

18

83. By reporting the Mixed Account and other personal information in the credit file presumably about Plaintiff, despite the fact that the account and information do not belong to Plaintiff, Equifax failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

84. Equifax committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking credit by prejudicing their prospective lenders with inaccurate account information.

85. As a result of Equifax's inaccurate report, Plaintiff was placed at serious risk of losing a valuable mortgage opportunity and long-term housing stability.

### Plaintiff's Dispute with Equifax November 2025

86. On November 25, 2025, desperate to secure her mortgage with HMA and riddled with worry over the far-reaching impacts of the mixed-file error, Plaintiff contacted Equifax and submitted a formal dispute regarding the inaccurate account.

87. Plaintiff also disputed the associated address in Miami, FL 33142, which does not belong to her.

88. Plaintiff identified herself and provided information to Equifax to support her dispute.

## The Credit Bureaus' Method for Considering Consumer Credit Report Disputes

89. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

90. The credit bureaus, Defendant, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

91. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

92. It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

93. Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

94.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

95.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

96.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

97.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

98.    The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

99.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to

the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

### Defendant's Unreasonable Dispute Reinvestigation

100. On or about December 18, 2025, Equifax issued dispute results to Plaintiff, which confirmed that the inaccurate account continued to be reported on her credit file.

101. Equifax sent HY Cite an ACDV pursuant to Plaintiff's November 2025 dispute to Defendant Equifax.

102. On December 18, 2025, Equifax issued dispute results to Plaintiff wherein it communicated that the disputed Mixed Account was "verified" as accurate.

103. Equifax failed to adequately review all of the information provided to it by Plaintiff.

104. Equifax failed to reinvestigate Plaintiff's November 2025 dispute and failed to remove the disputed information.

105. Upon information and belief, Equifax merely parroted HY Cite's erroneous "verification" and did not independently reinvestigate Plaintiff's dispute.

106. Equifax failed to conduct a reasonable investigation of Plaintiff's November 2021 dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

22

107. Thereafter, Equifax failed to unmix Plaintiff's credit file from that of the other consumer and likely Defendant continued to report the other consumer's information to Plaintiff's credit file.

### HMA Requests Plaintiff's Equifax Credit Report from Defendant Again And Defendant Reports the Misinformation

108. Subsequently, on January 12, 2026, in a continued effort to proceed with her mortgage, Plaintiff requested that HMA obtain her credit reports again.

109. On January 12, 2026, Equifax again sold a credit report about Plaintiff to HMA in response to Plaintiff's mortgage application.

110. Upon review of the January 12, 2026, Equifax credit report, the same inaccurate account remained listed.

111. Despite Plaintiff's prior dispute, the Mixed Account was republished, continuing to negatively affect her creditworthiness.

112. By reporting the Mixed Account in the credit file presumably about Plaintiff, despite the fact that the account and information do not belong to Plaintiff, Equifax failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

113. At all times pertinent hereto, Equifax was acting by and through their agents, servants, and/or employees who were acting within the course and scope of

23

their agency or employment, and under the direct supervision and control of the Defendant herein.

114. At all times pertinent hereto, Defendant's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

115. As a standard practice, Defendant does not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the credit furnisher, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

116.   Equifax is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs.  Accordingly, Defendant's violations of the FCRA are willful.

117.   As a result of Equifax's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; loss of ability to purchase and benefit from her credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

### Plaintiff's Damages

118.   As a result of the "mixed file," Equifax made it practically impossible for Plaintiff to obtain credit.

119.   Plaintiff's mortgage application with HMA has been placed on hold pending resolution of the reporting of the Mixed Account. Plaintiff initially applied in November 2025, and the issue has persisted for several months, causing her considerable frustration.

120.   Plaintiff applied for the mortgage jointly with her husband, and the ongoing reporting errors have prevented both from proceeding with their application, leaving Plaintiff feeling as though she is letting her husband down.

121.   Purchasing a home has been Plaintiff's lifelong dream. Learning that she could not proceed with the mortgage application caused Plaintiff deep disappointment and distress.

122.   As a direct and proximate result of Equifax's inaccurate reporting, Plaintiff was unable to proceed with her mortgage application and was thereby deprived of the opportunity to purchase a home. At the time, Plaintiff was renting an apartment for $1,475 per month and was actively seeking to transition into homeownership. However, due to Equifax's conduct, Plaintiff was forced to remain in the rental market and, on March 5, 2026, relocate to a new apartment with a higher monthly rent of $1,750. As a result, Plaintiff has incurred increased housing expenses and continues to suffer ongoing financial harm. Moreover, rather than building equity in her own home, Plaintiff remains a renter, causing her to lose the long-term financial and wealth-building benefits associated with homeownership

123.   In addition, the inaccurate account on her credit history has caused a significant drop in her Equifax credit score.

124. Further, on or about November 19, 2025, Plaintiff applied for a credit card with Wells Fargo but was denied due to the inaccurate information reported by Equifax.

125. Specifically, Wells Fargo's adverse action notice provided the following reasons for denying Plaintiff's credit application: "Balance-to-credit limit ratio on revolving accounts is too high," "Length of time of the accounts," "Length of time of revolving accounts," and "Ratio between loan balances and loan amounts too high."

126. Upon information and belief, these stated reasons for denial—specifically the high balance-to-limit ratio and debt-to-loan ratios—were directly and proximately caused by the inaccurate Mixed Account which was reporting with a 94% credit utilization rate.

127. Plaintiff needed the additional credit from Wells Fargo to pay for car repairs after her car broke down.

128. The ongoing errors and Equifax's failure to correct the inaccurate reporting despite Plaintiff's dispute have caused significant frustration and emotional distress. The situation has taken a substantial emotional toll on Plaintiff and her family, resulting in considerable sadness and anxiety.

129. At all times pertinent hereto, Equifax was acting by and through their agents, servants, and/or employees who were acting within the course and scope of

their agency or employment, and under the direct supervision and control of the Defendant herein.

130.    At all times pertinent hereto, Equifax's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

**CLAIMS FOR RELIEF**
**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendant Equifax)**

131.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

132.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

133.    On at least one occasion in 2025 and/or 2026, Defendant prepared patently false consumer reports concerning Plaintiff.

28

134. Defendant mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

135. Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

136. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

137. Defendant's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

29

138.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendant Equifax)**

139.    Plaintiff re-alleges and incorporates by reference the allegations in Paragraph Nos. 1-130 as though fully stated herein.

140.    The FCRA mandates that Defendant conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id*.

141.    The FCRA provides that if Defendant conducts its reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is unable to otherwise verify the accuracy of the disputed information, it is required to delete the item of information from the consumer's file.    *See* 15 U.S.C. § 1681i(a)(5)(A).

142.    Plaintiff initiated a dispute with Defendant and disputed inaccurate information reporting in her credit file and requested that Defendant correct and/or

30

delete the inaccurate, misleading, and highly damaging information belonging to an unrelated consumer.

143.   Defendant failed to conduct a reasonable reinvestigation of Plaintiff's dispute and instead verified patently false and highly damaging information, allowing the Mixed Account to remain in Plaintiff's credit file, resulting in future publication of the inaccurate information.

144.   Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's credit files.

145.   As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to: damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and

31

having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

146.   Defendant's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

147.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter a judgment awarding Plaintiff actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs and awarding Plaintiff such other and furth relief as the Court may deem appropriate and proper.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED on Mach 31, 2026.

By:/*s/ David Pinkhasov*
David Pinkhasov, FL # 1040933
CONSUMER ATTORNEYS
68-29 Main Street

32

Flushing, NY 11367
T: (718) 701-4605
F: (718) 247-8020
E: dpinkhasov@consumerattorneys.com

*Attorneys for Plaintiff,*
*Claudina Suazo Garcia*

33